**DEBBIE G., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

**Charles F., Appellant,**

v.

**State of Alaska, Department of Health and Social Services, Office of Children's Services, Appellee.**

**Nos. S–11778, S–11782.**

Supreme Court of Alaska.

April 7, 2006.

Kathleen Murphy, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant Debbie G.

Paul Ewers, Law Office of Paul Ewers, Fairbanks, for Appellant Charles F.

Megan R. Webb, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee State of Alaska, Department of Health and Social Services, Office of Children's Services.

Julie L. Webb and Mark Andrews, Fairbanks, for Appellee Native Village of Nulato.

Before: BRYNER, Chief Justice, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Parents who are admittedly unable to care for their son argue that he is not in need of aid because there is a relative willing to care for him. The superior court, finding that the parents' designation of someone else to care for their child did not remedy their conduct that had placed the child at risk, terminated their parental rights. Because the parents' plan provides neither permanency nor assurance that they would not try to regain physical custody if they were to retain parental rights, and because the applicable statute, AS 47.10.088, only permits return of children to their parents and not to other relatives, we affirm.

### II. FACTS AND PROCEEDINGS

John G. was born two months prematurely, on April 8, 2003.[1] He is classified as a "special needs child." Both of John's biological parents have a history of substance abuse, mental problems, and criminal activity. The parents, Debbie G. and Charles F., acknowledge that they are either unwilling or unable to care for John. Debbie and Charles are not married to each other and reside together off and on.

When John was six weeks old and still in the hospital, the Office of Children's Services (OCS) took emergency custody. The next day Debbie signed papers relinquishing her parental rights, but she changed her mind a few days later. When John was released from the hospital he was placed in foster care with the Smith family, because the Smiths had adopted John's half-brother. Debbie had suggested that the Smiths take custody of John when he was released from the hospital. In June 2003 Charles was identified as John's father. At an adjudication hearing in August Charles stipulated that he was unable to care for John and agreed to the state taking temporary custody.

Debbie has declared that she cannot raise John and since August 2003 has confirmed that she wants relatives to care for the child.

Both parents have now agreed that they want Charles's sister, Aunt Eva, to "raise" John. At times Charles appears to have been against actual adoption by Aunt Eva. Sometimes Charles spoke of having John placed with a relative only temporarily, perhaps until the child was eight or ten years old.

John's paternal grandmother has also been considered as a possible caretaker for John. In fall or early winter of 2003, when John was about six months old, she requested that John be transferred to her custody while the home study on Aunt Eva was pending.

In April 2004 OCS sought termination of parental rights based on the parents' continued lack of ability or desire to raise John. By September OCS had considered three adoption options for John: John's Aunt Eva, John's paternal grandmother, and the Smith family; it determined that the Smith family was the best permanent placement.

Following a September trial on the state's petition for termination of parental rights, the superior court issued a ruling terminating the parental rights of both parents. It found that the parents had "abandoned" John and that their "use of alcohol to excess, cocaine and fights make it physically dangerous for [John], a special needs child, to be in their care." The superior court ruled that "[t]he parents have not, within a reasonable time, remedied the conditions in their home that place [John] at substantial risk of harm or risk of physical or mental injury."

Both parents appeal.

### III. DISCUSSION

#### A. Standard of Review

In a child in need of aid (CINA) proceeding

[w]e apply the clearly erroneous standard when reviewing the superior court's factual findings. Factual findings are clearly erroneous when we are convinced, upon review of the entire record, that a mistake has been made. Whether the superior court's factual findings satisfy applicable

---

1. We use pseudonyms for all individuals in this case.

CINA rules is a question of law subject to de novo review.[2]

We apply our "independent judgment when reviewing a lower court's interpretation of statutes and other related legal questions."[3]

### B. Parents Who Place the Child at Risk of Harm Do Not Remedy the Conduct or Condition by Designating a Relative To Raise the Child.

■ Debbie G. and Charles F. argue that they "remedied" the conduct or conditions that risked harm to their son by designating a relative to care for him, and therefore satisfied AS 47.10.088(a)(1)(B).

Alaska Statute 47.10.088 provides in pertinent part:

(a) Except as provided in AS 47.10.080(o), the rights and responsibilities of the parent regarding the child may be terminated for purposes of freeing a child for adoption or other permanent placement if the court finds

(1) by clear and convincing evidence that

(A) the child has been subjected to conduct or conditions described in AS 47.10.011; and

(B) the parent

(i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury. . . .

John has been subjected to conditions described in AS 47.10.011 (including the mother's admitted substance abuse), thus satisfying AS 47.10.088(a)(1)(A).[4] Debbie and Charles admit they are unable to care for John. The only question they raise on appeal is whether under AS 47.10.088(a)(1)(B) the parents "remedied ... conditions in the home" that had threatened John's safety.

The parents argue that if John were returned to their care he would be cared for by a relative, and that consequently they would present no danger to him. They argue that sending the child to a relative would remedy the conduct and conditions in the home that place the child at substantial risk, not by changing the conduct and conditions which had previously placed the child at risk, but by changing the child's residence so that the ongoing dangerous conduct or conditions would no longer pose a risk to the child.

We acknowledge that in some circumstances the parents' reading of AS 47.10.088(a)(1)(B) would not be implausible, and moreover, that in some circumstances sending a child to live with relatives would be an appropriate and responsible way to eliminate a risk of harm to a child. Given the facts of this case, however, AS 47.10.088(a)(1)(B)(ii) permits termination of parental rights.

It is important that AS 47.10.088(a) declares that "the rights and responsibilities of the parent regarding the child may be terminated for purposes of freeing a child for adoption or other *permanent* placement." (Emphasis added.) The statute emphasizes permanent placement of children. This is so

---

**2.** *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 6 (Alaska 2003).

**3.** *Paxton v. Gavlak*, 100 P.3d 7, 10 (Alaska 2004).

**4.** AS 47.10.011 provides in relevant part:
Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:
(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;
. . .

. . . .
(6) the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian ...
. . . .
(10) the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant ...
(11) the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury. . . .

because moving children from family to family can be disruptive and unhealthy for children.[5] The emphasis on permanency in subsection (a) informs our reading of the rest of AS 47.10.088.

Alaska Statute 47.10.088(a)(1)(B) only contemplates "returning the child to the parent," not to other relatives, once the child is in state custody. In light of the permanency requirement that underlies all of AS 47.10.088, the statute implies that a parent's remedial efforts satisfy the statute only if they remedy the risk posed by returning the child to the parent. Allowing parents who are admittedly unfit to raise a child to simply designate others to raise the child for them would not ensure a permanent placement. Such parents would be legally entitled to demand physical custody from the relative at any time, perhaps after only a few weeks or months.[6] If that happened, either CINA proceedings would again be needed, or the state would have to permanently monitor the parents' conduct. The statute is intended to avoid such ongoing efforts and impermanent placements.

We therefore read AS 47.10.088 to require that parents remedy their conduct that would place the child at risk if the child were returned to their custody, even if this conduct would not present an immediate threat while the child resided with relatives. The superior court found that the parents' "use of alcohol to excess, cocaine and fights make it physically dangerous for [John], a special needs child, to be in their care." The superior court went on to conclude that, given the parents' history of violence and substance abuse, John "would likely suffer harm within hours of being in their care." Short of terminating their parental rights, there is no way to ensure that the parents' conduct would not threaten the child. We therefore hold that if

parents have not remedied the conduct that poses an active threat to a child's safety, merely designating a relative as primary caretaker does not "remedy" the conduct and therefore does not satisfy AS 47.10.088(a)(1)(B)(ii).

### C. John's Parents Have No Right To Direct His Adoption.

■ Charles also argues that the state should have permitted the parents to designate who would adopt John. He cites AS 47.10.084(c), which provides in pertinent part:

When there has been transfer of legal custody or appointment of a guardian and parental rights have not been terminated by court decree, the parents shall have residual rights and responsibilities. These residual rights and responsibilities of the parent include, but are not limited to, the right and responsibility of reasonable visitation, consent to adoption, consent to marriage, consent to military enlistment, consent to major medical treatment. . . .

We have previously noted that "[a]fter parental rights have been fully terminated, the former parent has no residual rights at all."[7] The issue before us is therefore whether, after custody was transferred but before the parental rights were terminated, the state should have followed the parents' adoption preference. Alaska Statute 47.10.084(c), however, only allows parents who retain parental rights to veto adoption; it does not confer any new rights on parents. It lists "residual rights" that are not lost with transfer of legal custody.[8] These rights are conferred in AS 25.23.040, which provides:

Unless consent is not required under AS 25.23.050, a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by

---

5. We have often noted that young children require "permanency and stability" or risk long-term harm. *See, e.g., Stanley B. v. State, Div. of Family & Youth Servs.,* 93 P.3d 403, 408 (Alaska 2004) (holding that "temporary placement, until [the father] is released from prison, would not satisfy the children's immediate need for permanency and stability").

6. We have held that parental rights include "[p]hysical possession of the child which, in the

case of a custodial parent includes the day-to-day care and companionship of the child." *L.A.M. v. State,* 547 P.2d 827, 833 n. 13 (Alaska 1976).

7. *C.W. v. State,* 23 P.3d 52, 57 (Alaska 2001) (holding that parents had no right to visitation after termination of parental rights).

8. *See* AS 47.10.084(c).

(1) the mother of the minor; [and]

(2) the father of the minor....

This section confers only a negative right. The child cannot normally be adopted without the consent of the parents, but this section does not give parents any affirmative legal right to require the state to permit a particular adoption. Charles cites no precedent supporting a different reading of AS 47.10.084(c). Our explanation in a previous case of the reasons for the consent provision confirms the absence of an affirmative right. In *Delgado v. Fawcett* we characterized the parent's right to consent to adoption as "the right to peremptorily veto the adoption of his child"[9] and noted that "the consent provisions are designed to protect the natural rights of a parent to the custody, society, comfort, and services of the child."[10] Parents whose parental rights are being terminated therefore have no affirmative right to have their child adopted by a person of their choosing.

## IV. CONCLUSION

Because Debbie and Charles's designation of a relative as caregiver for John did not remedy the risk of harm they pose to John, and because parents have no affirmative right to decide who will adopt their children, we AFFIRM the ruling of the superior court.

MATTHEWS, Justice, not participating.

**9.** *Delgado v. Fawcett*, 515 P.2d 710, 712 (Alaska 1973).

**10:** *Id.* (quoting *In re Parks' Petition*, 267 Minn. 468, 127 N.W.2d 548, 553 (1964)).