JON S., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–13257.

Supreme Court of Alaska.

July 31, 2009.

Jill Wittenbrader, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

David T. Jones, Assistant Attorney General, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

A father challenges a superior court order finding his daughter, an Indian child under the Indian Child Welfare Act (ICWA), to be a child in need of aid and terminating his parental rights. We conclude that the record contains sufficient evidence to support the superior court's findings that: (1) the daughter was a child in need of aid; (2) the father failed to remedy the conduct or conditions placing her at harm; (3) the state met its active efforts burden; (4) returning the daughter to the father would beyond a reasonable doubt be likely to cause her serious emotional harm; and (5) termination of parental rights was in the best interests of the child. We therefore affirm.

## II. FACTS AND PROCEEDINGS

Melissa[1] was born in October 2004. She qualifies as an Indian child through her mother, Mae, and is affiliated with the Native Village of Barrow.[2] At the time of Melissa's birth her father, Jon, was living in Seward and was on discretionary parole for felony assault.

Shortly before April 2005, Mae took Melissa to Seward to live with Jon so Mae could enter treatment. In April 2005 Jon's parole was revoked and he was reincarcerated. Considering Melissa's second temporary placement to be unsafe, the State of Alaska, Office of Children's Services (OCS) filed an emergency child in need of aid (CINA) petition on June 29, 2005. Jon's OCS caseworker, Tonja Whitney, unsuccessfully attempted to place Melissa through her tribe, then placed her in a foster home in Kenai for one month.

OCS placed Melissa with Jon after his release in July 2005. Between August 2005 and April 2006 OCS developed and updated Jon's case plan and helped Jon and Melissa obtain essential services. OCS also requested information about Jon's family for a possible placement. Robyn Noel, Jon's new OCS caseworker, later testified that Jon was "doing wonderfully" on his case plan, that Melissa appeared "well attended to" and "happy," and that OCS planned for Melissa to stay with Jon until she could be reunified with either parent. Noel also stated in a report that Jon and Melissa had "formed healthy bonds of trust and affection."

In April 2006 Jon tested positive for cocaine. His parole was revoked and he was again incarcerated.

OCS took Melissa back into state custody. Noel unsuccessfully attempted to contact Mae and to place Melissa through her tribe. OCS placed Melissa in two temporary Anchorage foster homes while pursuing placements in Seward and Kenai, and with Jon's parents in Washington, and discussed transferring the case to Anchorage to facilitate visits with Jon.[3]

Although both Jon and Noel testified that they made several attempts to contact the other, Jon spoke to OCS only once between April and August 2006.

In August 2006 OCS located a foster home in Kenai but was still considering relatives in Barrow or Washington. The case plan goal remained for Jon to care for Melissa until Mae finished treatment.

1. Pseudonyms have been used to protect the privacy of the family members.

2. *See* 25 U.S.C. § 1903(4) (2006).

3. The Anchorage supervisor stated that such a transfer would "not really fit policy." Robyn Noel remained Jon's OCS worker through the termination trial.

By mid-August 2006 OCS had placed Melissa in her current foster home in Kenai. When Melissa arrived she was exhibiting severe behavioral problems indicative of an attachment disorder.

On August 29, 2006, Jon was released to a halfway house in Anchorage and placed on mandatory reparole. He did not inform OCS of his release. Jon testified that in September or October 2006 he called from the halfway house and asked Noel to bring Melissa to visit him. Between Jon's August release and April 2007, OCS unsuccessfully attempted to contact Jon but did not hear from him. During that time Noel traveled to Atqasuk and Barrow to meet with Mae, worked to find a long-term placement through Melissa's tribe or with Jon's family, and updated Jon's case plan.

Mae asked in February 2007 to relinquish her parental rights. In April 2007 OCS requested a permanency hearing, stating its intention to file a petition to terminate Jon's parental rights. Shortly thereafter Jon was arrested for violating parole and OCS located him in jail.

In May 2007 Mae voluntarily relinquished her parental rights. OCS filed a petition to terminate Jon's parental rights in August 2007. It created a new case plan in September 2007, listing the goal as adoption, with Jon's family a possibility. Noel unsuccessfully pursued placement with Jon's family.

Also, OCS arranged for Melissa to visit Jon in jail in September 2007. The visit appeared to go well, but Noel testified that shortly thereafter Melissa regressed to attachment disorder behaviors.

In October 2007 Dr. Paul Turner, a clinical psychologist, examined Melissa at OCS's request. Dr. Turner concluded that Melissa had a "disorganized attachment disorder," resulting from "persistent disregard" for her basic emotional and physical needs and "impairment in the formation of stable attachment figures." He found that her attachment disorder had improved while she was with her foster family, that she had a "healthy, solid attachment" to them, and that a change in her placement would have "significant negative ramifications for her development." He recommended no further visits with Jon.

In March 2008 Jon's attorney arranged one two-hour visit between Melissa, Jon, and a counselor, Valerie Demming, apparently in preparation for Demming to testify as Jon's witness at Jon's termination hearing.

The termination hearing began on April 1, 2008, and lasted six days. The court heard testimony from Jon; two OCS caseworkers, Whitney and Noel; two parole officers; the chemical dependency counselor who conducted Jon's substance abuse assessment; Dr. Turner, testifying as an expert in clinical psychology; and Demming, who did not testify as an expert because of her limited knowledge of the case.

In August 2008 the court issued an order with findings of fact and conclusions of law. First, the court found that Melissa was a child in need of aid on four grounds: (a) abandonment, (b) failure to make adequate arrangements while incarcerated, (c) mental injury, and (d) habitual use of intoxicants. Second, the court found by clear and convincing evidence that Jon had not remedied this conduct or these conditions and that doing so would take him at least a year, which would be too long for Melissa. Third, the court found that the state had met its active efforts burden under ICWA. Fourth, the court found that giving Jon custody would, beyond a reasonable doubt, be likely to result in serious emotional damage to Melissa. Finally, the court found that it was in Melissa's best interests to terminate Jon's parental rights.

Jon appeals each of these rulings except for the court's finding concerning Melissa's best interests.

## III. DISCUSSION

▮▮▮▮▮ Before terminating parental rights under ICWA and the CINA statutes and rules,[4] a superior court must find by clear

---

4. *See* 25 U.S.C. §§ 1901–1923, 1931–1934, 1951–1952, 1961–1963 (2006); AS 47.10.088; CINA Rule 18; *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004).

and convincing evidence that: (1) "the child has been subjected to conduct or conditions described in AS 47.10.011"; [5] (2) the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm" or "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury"; [6] and (3) in the case of an Indian child,[7] "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." [8] Also, under ICWA, the court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." [9] Finally, the court must find by a preponderance of the evidence that "termination of parental rights is in the best interests of the child." [10]

### A. Standard of Review

 Whether the superior court's factual findings satisfy ICWA and the CINA statutes and rules raises questions of law to which we apply our independent judgment.[11] Whether substantial evidence supports the court's findings that the state complied with ICWA's "active efforts" requirement and proved beyond a reasonable doubt that

granting the parent custody would likely result in serious damage to the child are mixed questions of law and fact.[12] We review factual findings for clear error, reversing only if, after "a review of the entire record in the light most favorable to the party prevailing below," we are left "with a definite and firm conviction that a mistake has been made." [13] We "bear in mind at all times that terminating parental rights is a drastic measure." [14]

### B. Whether It Was Error for the Superior Court To Find that Melissa Was a Child in Need of Aid

 The superior court found by clear and convincing evidence that Melissa was a child in need of aid under AS 47.10.011(1) (abandonment), .011(2) (failure to make adequate arrangements while incarcerated), .011(8) (mental injury), and .011(10) (habitual substance use). Jon appeals each of these findings.

Under AS 47.10.011(1), a child is "in need of aid" if the court finds "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid." Mae voluntarily relinquished her parental rights. The "other parent" prerequisite has therefore been met.[15]

The court found by clear and convincing evidence that Jon abandoned Melissa by "failing to provide reasonable support or maintain any meaningful contact with [Melis-

---

5. AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

6. AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i).

7. *See* 25 U.S.C. § 1903(4). Although Jon is not Indian, ICWA applies because Melissa is Indian. *See K.N. v. State*, 856 P.2d 468, 474 n. 8 (Alaska 1993).

8. 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

9. 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

10. CINA Rule 18(c)(3); *see also* AS 47.10.088(c). Jon does not appeal this finding.

11. *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 954–55 (Alaska 2005) (CINA); *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000) (ICWA).

12. *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002) (beyond a reasonable doubt likely to cause serious harm); *T.F. v. State, Dep't of Health & Soc. Servs.*, 26 P.3d 1089, 1092 (Alaska 2001) (active efforts).

13. *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 672 (Alaska 2008) (internal quotation marks omitted) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

14. *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 184 (Alaska 2008) (internal quotation marks omitted) (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

15. *See Rick P.*, 109 P.3d at 956.

sa] for over one year." Jon argues that this finding was clearly erroneous because his behavior did not exhibit conscious disregard for his parental obligations, and because his conduct did not destroy the parent–child relationship.

We hold that the superior court's finding of abandonment was not clearly erroneous. Jon failed to provide support by not paying child support after being released from jail in August 2006, even though he was working. Jon failed to maintain meaningful contact and made only one contact with OCS between April 2006 and May 2007.[16] And despite the bonds and affection between Melissa and Jon, Jon's conduct in violating parole and in falling out of contact led to his absences and Melissa's foster care placements,[17] which in turn led to Melissa's disorganized attachment disorder, to which she regressed after visiting with Jon. Substantial evidence supports the superior court's conclusions that Jon demonstrated a conscious disregard for his parental obligations that led to the destruction of the parent–child relationship.[18]

The superior court's finding by clear and convincing evidence that Melissa was a child in need of aid under AS 47.10.011(1) (abandonment) was not clearly erroneous. Because only one statutory basis is required for a CINA finding, we do not need to address the superior court's other CINA findings.[19]

## C. Whether It Was Error To Find that Jon Failed To Remedy the Harmful Conduct or Conditions

■ Before a court may terminate parental rights, it must find by clear and convincing evidence that the parent has failed to remedy the harmful conduct or conditions.[20]

Jon argues the court erred in finding a failure to remedy because, by the time the court issued its order, he had been out of jail for four months, he was off parole, and there was no evidence of any substance use for two years. The state responds that Jon's pattern of making choices leading to incarceration demonstrates failure to remedy, and that it

16. The court found Jon's testimony that "he tried to call OCS several times during this time period ... neither credible nor convincing"; it also found that even if Jon were telling the truth, "such token efforts do not show a genuine effort to maintain a relationship with a young child who has had minimal contact with her father for almost half of her life." *See Jeff A.C., Jr. v. State,* 117 P.3d 697, 704 (Alaska 2005) (stating that "token efforts to communicate with a child" are insufficient (quoting *In re H.C.,* 956 P.2d 477, 481 (Alaska 1998))). Although Jon testified that he called many times from jail but was unable to get through, he could not produce any supporting documentation, even though the jail required him to submit written requests to make the calls, and he produced such requests from 2007. We have held that trial courts are in the best position to weigh witness credibility, and we give particular deference to findings based on oral testimony. *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 174 P.3d 217, 222 (Alaska 2007); *Martin N.,* 79 P.3d at 53.
According to the testimony of Jon, Noel, and Jon's parole officer, Jon failed to notify OCS of his August 2006 release, failed to provide address and contact information, and failed to make contact by telephone or mail (except for two or three calls to OCS, one of which resulted in Jon leaving a voicemail) with OCS or Melissa between August 2006 and May 2007.

17. Cf. *T.F. v. State, Dep't of Health & Soc. Servs.,* 26 P.3d 1089, 1093–94 (Alaska 2001) (noting that even though state contributed to delay in paternity testing, father bore responsibility because he absconded before test could be rescheduled).

18. See *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 67 P.3d 648, 651–52 (Alaska 2003) (quoting *E.J.S. v. State, Dep't of Health & Soc. Servs.,* 754 P.2d 749, 751 (Alaska 1988)); see also AS 47.10.013(a).

Jon argues the court failed to acknowledge he "was incarcerated during much of this time," but the court largely based its findings on Jon's objective conduct after he was released from jail in August 2006.
Although Jon expressed his desire to have custody of Melissa and testified he requested pictures and visits with her, the superior court properly focused on objective evidence, not Jon's subjective intent. See *In re B.J.,* 530 P.2d 747, 749 (Alaska 1975).

19. See *G.C.,* 67 P.3d at 651.

20. AS 47.10.088(a)(2); see also AS 47.10.088(b) (stating that court may consider any fact relevant to child's best interests, including "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs"); *Rick P.,* 109 P.3d at 958 (stating that fact that young child has lived without parent for significant period of time may be sufficient evidence of substantial risk of mental injury).

would not be in Melissa's best interest to return her to Jon, given Melissa's "age and needs" and Noel's testimony that it would take Jon eighteen months to remedy his conduct.

Substantial evidence supports the finding of failure to remedy. Noel testified that before visitation could occur, Jon would have to undergo a substance abuse assessment and treatment, something he had not done at the time of trial, and demonstrate nine months of documented post-treatment sobriety. Noel also testified that it would probably take Jon approximately "a year and a half or better" to complete the tasks necessary for reunification, and that because of Melissa's age and the fact she had already been in custody for twenty-eight months, a year and a half more was "just too long to ask of a toddler."

Dr. Turner testified that reunification could occur only after Jon demonstrated that he could provide stability, take care of his basic needs, and "be free of substances," and after Jon and Melissa had visitation that increased gradually. Dr. Turner testified that placing Melissa with Jon even nine months from the time of trial "represents a very serious risk to her" given her history with attachment disorder. Dr. Turner also testified "that a bond exists between [Melissa] and her present foster family, which is very critical at this stage of her life." Even Demming, who was supportive of Jon having a continued relationship with Melissa, testified that she would recommend frequent supervised contact "for an extensive period of time" and parenting classes before reunification.

The court did not clearly err in concluding that Jon had not remedied the conduct or conditions placing Melissa at risk.[21] It also did not clearly err in concluding that reunification would not be in Melissa's best interests.[22]

### D. Whether It Was Error To Find that OCS Made "Active Efforts" To Prevent the Breakup of the Family

■■■ ICWA requires that before a court may terminate parental rights, it must find by clear and convincing evidence "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[23] Although "no pat formula exists for distinguishing between active and passive efforts," distinctions do exist.[24] For example, active efforts require taking a parent through the steps of a plan and helping the parent develop the resources to succeed; drawing up a case plan and leaving the client to satisfy it are merely passive efforts.[25]

■■■ The parent's willingness to cooperate is relevant to determining whether the state has met its active efforts burden, and a parent's "incarceration is a significant factor" that "significantly affects the scope of the active efforts that the [s]tate must make to satisfy the statutory requirement."[26] In

---

21. See Stanley B. v. State, Div. of Family & Youth Servs., 93 P.3d 403, 407 (Alaska 2004).

22. See Debbie G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 132 P.3d 1168, 1170–71 (Alaska 2006) (explaining that AS 47.10.088(a) permits termination of parental rights to achieve "permanent placement" because moving children can be disruptive and unhealthy (citing Stanley B., 93 P.3d at 408 (emphasizing children's "immediate need for permanency and stability" and risk of long-term harm if permanent placement is not made immediately))); Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 102 P.3d 932, 936–37 (Alaska 2004) (concluding father failed to remedy because expert testified that it would be at least two years until reunification, child had been in foster care for over three years, and child needed stability and could not afford to wait).

23. 25 U.S.C. § 1912(d) (2006); CINA Rule 18(c)(2)(B).

24. A.A. v. State, Dep't of Family & Youth Servs., 982 P.2d 256, 261 (Alaska 1999) (internal quotation marks omitted) (quoting A.M. v. State, 945 P.2d 296, 306 (Alaska 1997)).

25. Id. (citing CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157–58 (1984)).

26. Id. at 261–62. Although incarceration does not absolve the state's active efforts duty, the court may consider the practical impact of incarceration on the possibility of active remedial efforts. Id. at 261.

evaluating whether the state has met its active efforts burden, we look "to the state's involvement in its entirety." [27]

Jon argues that OCS "made no effort to offer services to Jon" after Jon's April 2006 arrest, and failed to provide a substance abuse evaluation and treatment, and thus failed to meet its active efforts burden or even the "reasonable efforts" requirement in AS 47.10.086(a).[28] Jon also argues that OCS failed to meet its active efforts burden because it de facto terminated his AS 47.10.084(c) right of reasonable visitation by failing to provide reasonable visitation between April and August 2006. Finally, Jon argues that OCS failed to meet its active efforts burden because it did not comply with ICWA's placement preferences.[29] The state responds that it made active efforts both before and after Jon's April 2006 arrest. The court found by clear and convincing evidence that the state had met its active efforts burden.

The record contains substantial evidence supporting the superior court's finding that over the entirety of the case, from October 2004 until the termination trial in April 2008, the state made active efforts to prevent the breakup of the Indian family. We list these efforts because they reflect OCS's potentially useful and substantive efforts made in attempting to reunify the family. In 2005, when Jon and Melissa lived in Seward and Moose Pass, OCS made the following efforts: paid for and coordinated Jon's paternity test; advocated for financial and housing assistance for Jon and Melissa; spent approximately $700 in vouchers for diapers, clothes, medicine, and other supplies for Melissa; paid and arranged for Jon and Melissa to

visit Mae in Anchorage; conducted monthly home visits; provided referral services to SeaView Infant Learning Program and facilitated an evaluation for Melissa and parenting education for Jon; and established a case plan for Jon that included a referral to Sea-View Community Services for a substance abuse assessment.[30]

OCS's efforts in 2006 and 2007 included: establishing and updating case plans; coordinating with the guardian ad litem to help Jon and Melissa relocate to Anchorage to be closer to Mae and to improve job opportunities for Jon; helping Jon and Melissa get into a temporary shelter in Anchorage and finding day care for Melissa; helping Jon get bus passes in Anchorage; instructing Jon regarding visits between Melissa and Mae once Jon and Melissa had moved to Anchorage; setting up a urinalysis appointment after the April 2006 cocaine allegation; working with Mae, Melissa's tribe, and Jon to find a long-term placement for Melissa that would comply with ICWA; trying to locate and contact Jon by calling jail facilities, Jon's parole officers and attorney, and various shelters in Anchorage both before and after he disappeared in October 2006; referring Melissa to doctors for medical and psychological evaluations; traveling to Atqasuk and Barrow to meet with Mae and gather information about Jon's family; contacting family members of Mae and Jon for possible placement, preparing an Interstate Compact on the Placement of Children (ICPC) packet for placement with Jon's brother in Texas, and coordinating with a social worker in Texas on that placement possibility; and arranging for Melissa to visit Jon in jail in September 2007. Jon's parole officer also referred Jon to the

27. *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268–69 (Alaska 2008) (stating that although state failed to make active efforts for three months, superior court properly looked to entirety of efforts over three-year time period).

28. AS 47.10.086(a) provides, in relevant part: "[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents ... that are designed to prevent out-of-home placement of the child or to enable safe return of the child to the family home."

29. The dissenting opinion contends that OCS's failure to obtain the paternity test results early in the CINA case was a "critical" failure. Jon does not argue on appeal that any such failure rendered OCS's efforts ineffective.

30. Jon underwent the assessment in August 2005. SeaView did not recommend any follow-up treatment. The chemical dependency counselor who conducted the assessment later testified that Jon provided incomplete information and that had he known about Jon's criminal and substance abuse histories, he might have recommended treatment.

Cook Inlet Tribal Council's substance abuse assessment program in October 2006; Jon did not obtain the assessment.

Despite these extensive active efforts, the record does support Jon's argument that OCS's efforts declined after his April 2006 incarceration. Both Noel and Jon testified at length as to their communication problems; they communicated only once between April and August 2006, and may have communicated one more time in September 2006. Both Noel and Jon testified that they had discussed giving Jon photographs of Melissa and an additional visit with her, but that he received neither the photographs nor the visit.

We analyze the state's active efforts based on its "overall handling of the case," [31] including efforts by Jon's parole officers. Because the record and testimony show that OCS and Jon's parole officers made active efforts throughout 2005 and 2006, actively continued trying to locate Jon between October 2006 and April 2007, provided visitation with Melissa once Jon was located again, and actively pursued placement with Jon's family from October 2006 through November 2007, we hold that the superior court did not clearly err in finding that the state made active efforts.

Jon next argues that OCS failed to meet its active efforts burden because it de facto terminated his AS 47.10.084(c) right of reasonable visitation by failing to provide reasonable visitation between April and August 2006. Alaska Statute 47.10.084(c) states in part that if legal custody has been transferred but parental rights have not been terminated, "the parents shall have residual rights and responsibilities," including "reasonable visitation." [32] The circumstances do not establish the extreme facts necessary to conclude that Jon's parental rights were de facto terminated: Melissa was placed in a foster home in Alaska; Jon was out of contact with OCS and his parole officer even when out of jail; and through November 2006 OCS supported the concurrent goal of reunification with either parent. [33]

Jon also argues that OCS failed to make active efforts because it did not make sufficient attempts to place Melissa with one of his family members and because Melissa's placement is therefore not ICWA-compliant. The superior court concluded that Melissa's "current placement with her foster family is appropriate." ICWA gives preference first to extended family members, then to other members of the child's tribe, and finally to other Indian families. [34]

---

**31.** *See, e.g., Thomas H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 184 P.3d 9, 16 (Alaska 2008); *E.A. v. State, Div. of Family & Youth Servs.,* 46 P.3d 986, 990 (Alaska 2002); *N.A. v. Div. of Family & Youth Servs.,* 19 P.3d 597, 602–04 (Alaska 2001); *In re J.W.,* 921 P.2d 604, 609–10 (Alaska 1996).

Jon also argues that OCS failed to make active efforts because it should have transferred the case to Anchorage. Even if transferring the case would have facilitated more visits between Jon and Melissa, when the case and OCS's overall efforts are considered in their entirety, OCS's failure to transfer the case does not demonstrate that OCS did not make active or reasonable efforts to reunite the family. *See Maisy W.,* 175 P.3d at 1268–69; *Thomas H.,* 184 P.3d at 16.

Our conclusion that the superior court did not err in holding that the state met its active efforts requirement also disposes of Jon's argument that the state failed to meet the lower "reasonable efforts" requirement in AS 47.10.086. *Cf. Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 134 P.3d 343, 347 n. 18 (Alaska 2006) (applying reasoning of ICWA "active efforts" cases to AS 47.10.086 "reasonable efforts" case).

**32.** AS 47.10.084(c); AS 47.10.080(p) (stating that reasonable visitation is determined by considering in part "nature and quality" of relationship between parent and child before child was committed to OCS custody).

**33.** *Compare D.H. v. State,* 723 P.2d 1274, 1276–77 (Alaska 1986) (holding that decision permitting foster parents living in Fairbanks to relocate to Alabama was de facto termination of parental rights because father was "virtually penniless" and state would not pay for him to fly to see child), *with A.H. v. State,* 779 P.2d 1229, 1234 & n. 10 (Alaska 1989) (holding, in case in which state placed children in foster home in Anchorage, mother was in Juneau, family's financial situation prohibited regular visitation, and state had goal of visitation, that there was no de facto termination of parental rights because facts were not as "extreme" as those presented in *D.H.*).

**34.** 25 U.S.C. § 1915(a) (2006); *cf.* AS 47.14.100(e)(3) (preferring placement with family members, then family friends, then licensed foster homes that are not family members).

OCS made numerous efforts to place Melissa with Jon and Mae's family members, but those placements proved inadequate.[35] Both OCS caseworkers testified that on multiple occasions Melissa's tribe informed OCS it did not have any placement possibilities for Melissa. Melissa's current foster family is an Indian family, belonging to the Kenaitze Indian Tribe. This satisfies both ICWA and state law.[36] The superior court therefore did not err in concluding that the state made active efforts to ensure that Melissa's placement was ICWA-compliant.

The temporary decline in the state's efforts after Jon was reincarcerated in April 2006 is troubling. Although we conclude that the superior court permissibly held that the state met its statutory burden, we emphasize that to ensure an outcome in the child's best interests while simultaneously promoting reunification and reducing delays in achieving permanency, the state must zealously fulfill its active efforts duty. But we measure active efforts over the entirety of the case.[37] Despite the deficiencies ably cataloged in the dissenting opinion, we are not convinced that the superior court clearly erred in finding that the state made active efforts, or that it committed legal error in concluding there was clear and convincing evidence of active efforts.[38]

**E. Whether the Superior Court Erred in Finding that Returning Melissa to Jon Would Likely Result in Serious Emotional Harm**

 ICWA and CINA Rule 18 require the trial court to find beyond a reason-

---

35. The dissenting opinion correctly notes that the guardian ad litem recommended preparing an ICPC packet for Jon's parents in March 2006, and that OCS does not appear to have prepared an ICPC packet for any member of Jon's family until it did so for Jon's brother and sister-in-law, Robert and Betty, in September 2007. Despite that single failing, OCS made sufficient active efforts to place Melissa with Jon's family, including getting information from Jon about his family in March 2006; asking Jon for his parents' contact information in July 2006; getting contact information for Jon's family from Mae in September 2006; contacting Jon's parents and one of his sisters in October and November 2006; creating a case plan in September 2007 that included exploring Jon's family for possible placement options; and contacting Robert and Betty and preparing an ICPC packet for them in September 2007.

36. *See* 25 U.S.C. § 1915(a); AS 47.14.100(e)(3).

37. *See, e.g., Roland L. v. State, Office of Children's Servs.,* 206 P.3d 453, 456–57 (Alaska 2009) (holding that OCS's failure to make active efforts for first three months of case, during which time father was incarcerated, did not determine termination outcome); *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1268–69 (Alaska 2008).

38. The superior court based its active efforts finding on the following factual findings, all of which are supported by the record:

 OCS developed a case plan that included a referral for a substance abuse assessment and following all recommendations, providing stable and suitable housing, obtaining parenting education support, providing for [Melissa's] basic needs, and establishing [Jon's] paternity in order to qualify [Jon] for certain services/programs. OCS also advocated for [Jon] on four separate occasions to receive special funding from the Department to help him with purchases to meet [Melissa's] basic needs; drafted a letter to assist [Jon] in qualifying for public assistance and housing assistance; coordinated to set up multiple visits between the mother and [Jon] and [Melissa]; update the case plans for both parents as the case progressed; worked with [Jon] to help him relocate to Anchorage in order to more easily find a job and appropriate housing; provided day care assistance to allow [Jon] to apply for jobs and housing during the day. OCS case worker Robyn Noel made numerous attempts to locate and contact [Jon] by calling the Anchorage jail, [Jon's] attorney, [Jon's] Kenai probation officer, and [Jon's] Anchorage probation officer, as well as leaving and posting messages at Bean's Café and the Brother Francis Shelter. OCS also personally met with [Mae] in Atqasuk and obtained the names of paternal relatives for possible permanent placement and then followed up with the identified paternal family members to discuss placement of [Melissa]. OCS investigated individuals identified by [Mae] as possible placement/adoption alternatives, including following up with several of [Jon's] family members. OCS further submitted an ICPC request for [Robert and Betty S.] for possible placement and adoption. This placement fell through when [Robert and Betty] moved and were no longer available for consideration. OCS also arranged a visit between [Melissa] and [Jon] on September 24, 2007, and referred [Melissa] for psychological evaluation with Dr. Turner to assess the quality of her relationship with her current foster family and any impact on her to remove her from that family.

able doubt that the parent's custody would likely result in serious emotional or physical damage to the child.[39] Although the court must focus on risk of future harm rather than past injury, past failures may predict future conduct.[40] Proof of the likelihood of future harm "must include qualified expert testimony based upon the particular facts and issues of the case," but the trial court may aggregate this with other evidence as a basis for its finding.[41]

The court found beyond a reasonable doubt that returning Melissa to Jon would likely cause her harm; it based its conclusion on Dr. Turner's testimony and Jon's past behavior. Jon argues that Dr. Turner's expert testimony was not sufficient to support the court's finding because the testimony was not grounded in knowledge of the specific facts of the case.[42] The state responds that Dr. Turner's testimony, combined with evidence of Melissa's regression after visiting Jon in September 2007, supported the court's finding.

Dr. Turner's testimony was sufficiently grounded in important facts about Melissa's behavior and needs, and about Jon's suitability to parent; his testimony was not "fatally weakened" by "over-reliance on documents" or his failure to interview Jon.[43] Although Dr. Turner did not read the entire OCS case file, he read court records from 2005 to 2007, information from the guardian ad litem and OCS, the 2005 emergency petition for adjudication of child in need of aid, the 2006 predisposition report, an affidavit from the OCS caseworker, and early childhood inventories completed by Melissa's foster parents. He also spoke with Jon's social worker and Melissa's guardian ad litem and foster mother, and met with Melissa on four occasions. His testimony addressed many of the case's specifics and responded to hypotheticals based on information relating to the case.

The record contains substantial evidence of Jon's past pattern of making choices that led to incarceration or that caused him to disappear from Melissa's life, demonstrating his instability and inability to parent.[44] The record also contains substantial evidence of Melissa's history of physical and emotional problems and attachment disorder, how those problems are connected to Jon's absences from her life, and the risk that disrupting Melissa's current placement would cause her serious emotional and physical harm. The superior court therefore did not err in concluding that returning Melissa to Jon would likely result in serious emotional harm.

## IV. CONCLUSION

The superior court's order terminating parental rights is therefore AFFIRMED.

CHRISTEN, Justice, dissenting in part.

CHRISTEN, Justice, dissenting in part.

I agree with the court in all but one respect. In my view, OCS failed to make active efforts in this case.

Congress identified two policy goals in enacting ICWA: "to protect the best interests

**39.** 25 U.S.C. § 1912(f) (2006); CINA Rule 18(c)(4).

**40.** *J.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 38 P.3d 7, 11 (Alaska 2001); *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000) (quoting *E.M. v. State, Dep't of Health & Soc. Servs.*, 959 P.2d 766, 771 (Alaska 1998)).

**41.** *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002); *L.G.*, 14 P.3d at 950.

**42.** *See C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1218 (Alaska 2001); *J.J.*, 38 P.3d at 9–10.

**43.** *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 507 (Alaska 2009) (holding that this was not case in which "over-reliance on documents fatally weakened the expert's testimony" because although expert had not interviewed mother, daughter, or other service providers, expert had reviewed numerous documents and expert's testimony covered important facts in case); *E.A.*, 46 P.3d at 991–92 (holding testimony sufficient because, although experts had not interviewed parent, they had "substantial contact" with child, testified to specifics of child's needs and behavior, and testified to relationship between child's behavior and mother).

**44.** *See E.A.*, 46 P.3d at 992 (relying in part on substantial evidence of mother's "instability and parental incapacity outside of the experts' testimony").

of Indian children and to promote the stability and security of Indian tribes and families."[1] Our legislature and this court have recognized that permanency is in children's best interests.[2] But our case law allows "active efforts" to be measured over the entirety of a case, without regard to how long it takes to achieve permanency.[3] Our legislature has expressly recognized that delays in these cases can further victimize children and that multiple or prolonged placements can cause emotional harm.[4] Measuring OCS's active efforts over the entirety of a case, without regard for the impact of delays attributable to OCS, threatens to lower the "active efforts" standard and permits unnecessary—and harmful—delays in achieving permanency. In this case, the record shows that OCS's actions significantly lengthened the time it took to achieve permanency for Melissa, that these actions were inadequately explained, and that the resulting delays harmed Melissa and reduced her chances of reunifying with Jon or his extended family. I therefore respectfully dissent from the court's active efforts analysis.

## I. VIEWING THE ENTIRETY OF THE STATE'S EFFORTS WITHOUT REGARD FOR THE IMPACT OF DELAYS ATTRIBUTABLE TO OCS IMPERMISSIBLY LOWERS THE ACTIVE EFFORTS STANDARD.

Congress did not require that reviewing courts consider the entirety of the state's involvement in a case to determine whether active efforts have been made; our court adopted this approach by looking to case law from other jurisdictions.[5] Initially, our court applied this approach under relatively narrow circumstances, where three identified conditions existed: (1) efforts had been made to address a substance abuse problem, (2) the parent had shown no willingness to change, and (3) parental rights had been terminated as to another child.[6] This court began applying this approach when the burden of proof was preponderance of the evidence,[7] but it has continued to apply it in recent cases, without discussion, even though the law now provides that active efforts must be demonstrated by clear and convincing evidence to terminate parental rights.[8] And the

1. 25 U.S.C. § 1902 (2006); *see also A.B.M. v. M.H.*, 651 P.2d 1170, 1172 (Alaska 1982) (citing H.R.Rep. No. 95–1386, at 8 (1978) (stating the same), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7530). ICWA's requirements apply to non-Indian biological parents of Indian children. *See In re Adoption of T.N.F.*, 781 P.2d 973, 978 (Alaska 1989).

2. *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 55–56 (Alaska 2003) (identifying risk of harm resulting from disruptions in a young child's "critical attachment process" and emphasizing need to achieve permanency "expeditiously" to avoid this risk (quoting AS 47.05.065(5))); *see also Debbie G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 132 P.3d 1168, 1170–71 (Alaska 2006) (stressing the need to achieve a permanent placement to avoid multiple temporary placements).

3. *See Roland L. v. State, Office of Children's Servs.*, 206 P.3d 453, 456–58 (Alaska 2009); *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268–69 (Alaska 2008); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002); *N.A. v. State, DFYS*, 19 P.3d 597, 599, 603 (Alaska 2001).

4. AS 47.05.065(5).

5. *See* 25 U.S.C. § 1912(d) (2006); *N.A.*, 19 P.3d at 603–04 (establishing approach of looking to entirety of case and citing *Letitia V. v.Super. Ct.*, 81 Cal.App.4th 1009, 97 Cal.Rptr.2d 303, 308–09 (2000); *In re A.R.P.*, 519 N.W.2d 56, 60 (S.D. 1994)).

6. *See N.A.*, 19 P.3d at 603–04 ("Other courts have expressly held that where efforts have been made to address a substance abuse problem, the parent has shown no desire to change, and parental rights were terminated with respect to one child, ICWA allows the superior court to consider all of the efforts made by the state to avoid the breakup of the family in assessing whether those efforts were reasonable." (citing *Letitia V.*, 97 Cal.Rptr.2d at 308–09; *In re A.R.P.*, 519 N.W.2d at 60)); *see also E.A.*, 46 P.3d at 991 (same) (citing *N.A.*, 19 P.3d at 603–04).

7. *See E.A.*, 46 P.3d at 989–90; *N.A.*, 19 P.3d at 602.

8. *See* CINA Rule 18(c)(2)(B) & note; ch. 20, § 1–2, 8, SLA 2006 (heightening burden of proof); *Roland L.*, 206 P.3d at 456 (applying clear and convincing burden of proof and relying on *Maisy W.*, 175 P.3d at 1268–69, and *E.A.*, 46 P.3d at 990, to look to entirety of OCS's involvement); *Maisy W.*, 175 P.3d at 1268–69 (applying clear and convincing burden of proof and relying on *E.A.*, 46 P.3d at 990, and *N.A.*, 19 P.3d at 599, 603, to look to entirety of OCS's involvement).

application of this rule has expanded. In two recent cases our court looked to the entirety of the state's efforts to conclude the active efforts burden was met without considering whether the three conditions existed, focusing instead on the lengths of the time periods of active and passive efforts and on the degree to which the parent showed willingness or ability to change.[9]

Although our case law has evolved to take a more expansive view of the active efforts requirement, our legislature was unequivocal in identifying how delays in resolving child-in-need-of-aid cases can harm children. The legislative findings, set forth in AS 47.05.065, provide, in relevant part:

The legislature finds that

. . . .

(5) numerous studies establish that

(A) children undergo a critical attachment process before the time they reach six years of age;

(B) a child who has not attached with an adult caregiver during this critical stage will suffer significant emotional damage that frequently leads to chronic psychological problems and antisocial behavior when the child reaches adolescence and adulthood; and

(C) it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously.

I question the trajectory of our case law and believe the sequential approval of orders terminating parental rights in cases where significant delays attributable to OCS go unexplained may inadvertently undercut ICWA's important legislative goals and effectively lower the active efforts standard.

## II. AVOIDABLE, INADEQUATELY EXPLAINED, AND HARMFUL DELAYS ATTRIBUTABLE TO OCS ARE NOT CONSISTENT WITH ACTIVE EFFORTS.

OCS faces the difficult job of balancing efforts to reunify families with efforts to protect children's best interests.[10] There are no readily available "cures" for many of the problems that prompt OCS to assume emergency custody of children, such as long-term addictions. For this reason, some delays in resolving child-in-need-of-aid cases are inevitable. But unnecessary delays attributable to OCS that substantially reduce the chances for successful reunification or lengthen the time it takes to achieve permanency are not consistent with "active efforts."

The court's opinion lists steps taken by OCS in this case, but in my judgment whether "active efforts" were made should be a qualitative, not quantitative, question. Meeting the "active efforts" burden should require that OCS's efforts increase the likelihood that families will be reunified, or at least reduce the amount of time it takes to determine whether reunification will be possible. Where reunification is possible, a child's best interests are served by helping to reunify the family without the risk of harm from extended or multiple out-of-home placements. Where reunification is not possible, the child's best interests are served by initiating termination proceedings without avoidable delay.

The facts of Melissa's case lead me to conclude that OCS did not meet its active efforts burden because of three critical failures: (1) OCS failed to obtain paternity test results in the early stages of the case; (2) OCS did not train its caseworker on how to locate and communicate with Jon while he was in state prison; and (3) OCS failed to train its caseworker on how to interpret and apply ICWA's placement preferences, resulting in the caseworker waiting to pursue placement with paternal relatives until several months after the mother asked to relin-

---

**9.** See, e.g., Roland L., 206 P.3d at 456–57; Maisy W., 175 P.3d at 1269.

**10.** See 25 U.S.C. § 1902 (2006) ("The Congress hereby declares that it is the policy of this [n]ation to protect the best interests of Indian children. . . .").

quish her parental rights. In my judgment, these delays were attributable to OCS, avoidable, inadequately explained, and harmful to Melissa and her chances for reunification.

### A. The Failure To Obtain Paternity Test Results in a Timely Manner in the Early Stages of the Case Was Attributable to OCS, Inadequately Explained, and Harmful.

One factor the court cites in support of its conclusion that OCS made active efforts is that the caseworker arranged for paternity testing.[11] But the testing did not help Melissa achieve permanency; testing results were needed. Jon needed the test results to qualify for the financial assistance that could have better positioned him to find housing and employment earlier in the case. This assistance could have permitted OCS to determine, at an earlier point, whether he was likely to be able to successfully parent Melissa.

Jon submitted to a paternity test by fall 2005,[12] but OCS did not receive the results until sometime between December 2005 and March 2006. The results were not obtained earlier because the OCS caseworker did not know how to obtain them. The caseworker testified she "called the Bureau of Vital Statistics five or six times and left a message," and that it was not until she called OCS Anchorage in December 2005 or January 2006 that she learned that LabCorp does the testing. She then called LabCorp and received the results "within two weeks." Arranging for paternity testing, without knowing how to get paternity test results, is inconsistent with "active efforts."

Although OCS asked that Jon and Melissa receive priority consideration for financial assistance in light of the delayed paternity results, this assistance was denied. By March 2006, Jon still had not been approved for financial assistance. OCS's failure to obtain the test results promptly contributed to

delays in achieving permanency for Melissa and in reducing the likelihood of successful reunification; this failure was attributable to OCS, not adequately explained, and harmful to Melissa.

### B. OCS's Failure To Train Its Caseworker on How To Locate and Communicate with Jon While He Was in State Prison Was Unexplained and Harmful.

The second OCS social worker assigned to this case did not know how to locate and contact a parent in state custody. She testified she contacted Jon in state prison just once between April and August 2006, that this contact did not occur until July 2006, and that she did not contact Jon earlier because she did not know how to find or communicate with someone in state custody. In fact, she testified that she did not receive any guidance on how to communicate with state inmates, that this case was "a communication nightmare," and that she had not heard of the VINE-line for locating inmates or the Evercom phone system for calling and receiving calls from inmates. The caseworker also testified that when she took over the Seward OCS office, which had been "handled by transient social workers coming in and out of the office" and "hadn't been manned" for seven months, she received just "two weeks of training."

OCS undoubtedly faces geographic and budgetary challenges, but if it is to meet its active efforts burden, it must ensure that caseworkers receive adequate training, supervision, and access to resources. The near lack of communication with Jon while he was in prison for four months in 2006 inhibited his ability to make progress on his case plan and delayed OCS's ability to determine whether he was a likely candidate for reunification.[13]

The record shows that Melissa's lack of contact with Jon during this four-month in-

---

**11.** Op. at 764.

**12.** The record does not indicate the exact date when Jon took the paternity test, but the record suggests he took the test before late October.

**13.** The court's opinion correctly notes that the trial court did not find Jon's claims that he tried

to contact OCS while he was in prison credible. Op. at 762 n. 16. But OCS had an obligation to contact Jon; this is an ICWA case and OCS is obliged to use active, not passive, efforts.

carceration was damaging. Jon's caseworker testified that Melissa was "happy" and "well attended to" before the March 2006 pre-disposition hearing, and in its pre-disposition report OCS described Jon and Melissa as having "healthy bonds of trust and affection." Melissa was only eighteen months old when Jon was incarcerated in 2006. OCS knew that she was well-bonded to Jon and that she could not be placed with Mae while Jon was in jail. Yet OCS did not arrange any visits between Melissa and Jon during this four-month period of incarceration. By August 2006, when Melissa had been out of contact with Jon for four months and when OCS placed her in her current foster home, she was exhibiting severe attachment disorder symptoms, including suffering serious constipation that required medication, engaging in self-injurious behavior (biting her cheeks and cutting her gums), hiding food in her cheeks, holding her breath, exhibiting social withdrawal and hypersensitivity to touch, whispering, having anxiety and trouble sleeping, using little emotional expression or reaction, and showing expressive language delays. OCS's inaction while Jon was incarcerated in 2006 was neither consistent with "active efforts" nor with ICWA's policy goal of protecting the Indian child's best interests.[14]

### C. The Failure To Follow Statutory Placement Preferences and the Delay in Exploring Placement With Paternal Relatives Were Attributable to OCS, Inadequately Explained, and Harmful.

The record and testimony contain substantial evidence showing that OCS failed to train its social worker on placement preferences and that this failure caused an impermissible delay in pursuing a family placement per ICWA's placement preferences.[15] The record reveals that OCS considered Mae, Mae's mother's family, and a non-relative Alaska Native family as preferential placements over Jon or his non-Native family.[16]

For nearly two years, from June 2005 (when OCS took Melissa into emergency custody) until April 2007 (after Mae asked to relinquish her parental rights), OCS identified reunification with Mae as the permanent goal. Reunification with Mae remained the goal though Mae was in and out of treatment and jail and was out of contact with OCS for extended periods of time. Indeed, in July 2006 OCS expressed concern about pursuing placement with Jon's relatives in Washington because that would "make reunification more difficult[ ] when the mother resurfaces," though by this time Mae had been out of contact with OCS for around four months. Placement with Mae remained the goal even after she expressly refused to work on her case plan in fall 2006. This persistent focus on Mae is especially concerning because it caused OCS to delay researching a family placement with one of Jon's relatives, though OCS knew Mae had an ongoing and long-term addiction, had not successfully worked her case plans with her previous children, and was not likely to succeed with Melissa.

OCS did not fill out an ICPC packet for placement with Jon's family until September 2007. This was a year and a half after Jon gave OCS information about his family, and a year and a half after the guardian ad litem recommended an ICPC packet be prepared for Jon's parents in Washington. It was also a year after Mae asked OCS to contact Jon's family for placement, seven months after Mae asked to relinquish her parental rights, and three months after her parental rights were terminated. Although the record reveals that one of Jon's siblings discouraged OCS from placing Melissa with Jon's elderly parents, once OCS contacted Jon's other siblings, it discovered that at least two were interested in placement. In fact, Jon's brother was preliminarily approved, but because he moved to another state during the placement review due to a job transfer, the

14. 25 U.S.C. § 1902 (2006).

15. *See* 25 U.S.C. § 1915(a) (2006) (preferring extended family over non-family Native homes); *id.* § 1903(2) (defining extended family); *In re Adoption of Sara J.*, 123 P.3d 1017, 1021 n. 14 (Alaska 2005) ("[I]f one parent is Native and the other is not, the Indian child's extended family may include non-Native members who might argue for preferred placement status under ICWA.").

16. Jon is African–American.

placement was denied. The result may have differed had Jon's brother been contacted earlier in the case.

The delay in attempting to make contact with Jon's family and in filling out an ICPC packet for placement with his family resulted from OCS's failure to train its caseworker on ICWA's placement preferences. It is concerning that the testimony before the trial court revealed confusion within OCS about ICWA's preference for placement with a biological parent or that parent's extended family in instances where that preference order results in placement with family that is not Native.[17]

The caseworker's unfamiliarity with ICWA's placement preferences and OCS's delay in considering a permanent placement with Jon's family contributed to the length of time it took to achieve permanency for Melissa. The delay in achieving permanency caused harm to Melissa; while waiting for a permanent home, she went through three placements and developed an attachment disorder. The confusion over ICWA's placement preferences and the delay in pursuing placement with Jon's family resulted in a failure to make active efforts to prevent the breakup of the Indian family.

## III. CONCLUSION

Melissa has made important gains in her current foster home, and I agree with the court that she will benefit by remaining there. But in my judgment, the conclusion that OCS met its active efforts burden cannot be reconciled with the avoidable, inadequately explained, and harmful delays described above. For these reasons, I respectfully dissent from the court's "active efforts" analysis.

**17.** *See* 25 U.S.C. § 1915(a) (2006) (preferring extended family over non-family Native homes); *id.* § 1903(2) (defining extended family); *In re Adoption of Sara J.,* 123 P.3d at 1021 n. 14.