NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TIFFANY B.,<br><br>    Appellant,<br><br> v.<br><br>STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES,<br><br>    Appellee. | Supreme Court No. S-18111<br><br>Superior Court No. 3AN-17-00139 CN<br><br>MEMORANDUM OPINION<br>AND JUDGMENT*<br><br>No. 1898 – June 8, 2022 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances:  Emily L. Jura, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant.  Aisha Tinker Bray, Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee.  Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.  Hollis Handler, Tlingit & Haida Tribal Family and Youth Services, Juneau, for Central Council of Tlingit and Haida Indian Tribes of Alaska.

Before:  Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

Winfree, Chief Justice, dissenting, with whom Henderson, Justice, joins.

---

\*  Entered under Alaska Appellate Rule 214.

# I.    INTRODUCTION

A mother appeals the termination of her parental rights to her daughter, an Indian child as defined by the Indian Child Welfare Act (ICWA).  The mother argues that the Office of Children's Services (OCS) did not make active efforts to provide remedial services and rehabilitative programs as required by ICWA, that the superior court improperly relied on evidence not admitted at the termination trial, and that OCS and the superior court violated ICWA's notice requirements by failing to notify the correct tribe of the proceedings until two years after removal.  We agree that OCS did not satisfy ICWA's active efforts requirement and for that reason we reverse the termination order.  As a result, we need not address whether the superior court relied on improper evidence in its findings. And while we agree that the lack of timely notice to the tribe violated ICWA, the error was harmless and does not require any additional remedy.

# II.    FACTS AND PROCEEDINGS

## A.    Background

Tiffany is the mother of Andi,[1] an Indian child as defined by ICWA because of her father's affiliation with the Central Council of Tlingit and Haida Tribes (Tlingit & Haida).[2]  Andi's father, Tuck, voluntarily relinquished his parental rights before trial.

Tiffany has a history of mental illness.  At the age of 20, in November 2015, she gave birth to Andi.  According to Tiffany's mother, Tiffany said she did not

---

[1]    Pseudonyms are used throughout to protect the family's privacy.

[2]    25 U.S.C. § 1903(4) (defining an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

want the pregnancy and repeatedly hurt herself during its course.[3]  Andi was born early by C-section.  She tested positive for marijuana at birth, and hospital staff made a report to OCS.  The hospital released Andi on the condition that Tiffany and the baby live with Tiffany's parents, Ginny and Ray.

Ginny and Ray did most of Andi's caretaking.  According to Ginny, Tiffany continued to struggle after Andi's birth, sometimes threatening to harm Andi and herself.

## B.      Initial Protective Order And Emergency Removal

In March 2016 a one-year domestic violence protective order was entered against Tiffany on Andi's behalf.  The court gave Ginny and Ray temporary custody of Andi and prohibited Tiffany from being alone with the baby.  In March 2017, as the order was about to expire, OCS filed an emergency petition seeking temporary custody, and after a hearing Andi was placed with Ginny.

## C.      OCS's Interactions With Tiffany

The assigned OCS caseworker created a case plan in May 2017, which Tiffany did not sign.  The plan listed the primary goal for the case as adoption, with guardianship as an alternative, and called for Tiffany to have regular visits with Andi, restart mental health counseling, and receive a neuropsychological exam.  OCS was to obtain Tiffany's records and make referrals, but the caseworker testified at trial that she could not make the referrals because Tiffany would not sign a release of information.

The caseworker also testified that Tiffany became angry during their case-planning meeting, threatened to have the caseworker fired, and stormed out.  Tiffany failed to attend the next scheduled meeting.  The caseworker testified that Tiffany also missed the first adjudication hearing due to an apparent lack of transportation, although

---

[3]      Tiffany was admitted to the hospital several times during her pregnancy; on one occasion she was kept there for several days on an emergency mental-health hold after threatening to kill herself.

OCS had already provided her with bus passes; for the next hearing, OCS arranged a cab.

OCS referred Andi for a developmental screening, which indicated some developmental delays, and she was referred for services. The caseworker could not remember at trial whether she had informed Tiffany of Andi's developmental issues; she testified that Tiffany was not involved in Andi's treatment because it took place at Ginny and Ray's home and a protective order limited Tiffany's contact with Ray.[4] Andi was later diagnosed with autism spectrum disorder, for which she continued to receive treatment and therapy.

OCS facilitated visitation for Tiffany. An OCS visitation supervisor testified that it was difficult to schedule visits because of trouble reaching Tiffany, who was often late or failed to attend. A few visits were marred by Tiffany's angry outbursts. But visits later improved, and OCS contracted with Cook Inlet Tribal Council (CITC) to supervise them.

OCS made another case plan in February 2018 that was similar to the first; Tiffany did not sign this one either. The case plan required OCS to make referrals for a neuropsychological exam and counseling, though the record does not show whether these referrals were actually made. In September OCS filed a petition to terminate Tiffany's parental rights. A termination trial originally scheduled for March 2019 was postponed several times.

In January 2019 Tiffany and Tuck had an argument in front of Andi during visitation that resulted in a recommendation that future visits be supervised by two staff members. In September Tiffany began receiving mental health counseling from a therapist. An OCS worker wrote in October that Tiffany had made some positive

---

[4]    Later in the case Tiffany's involvement in Andi's treatment was also limited by OCS's determination that it would not be in Andi's best interest, given Tiffany's problematic behavior and the fact that the case was headed toward termination.

behavioral changes and recommended that OCS explore the possibility of a trial home visit.

The case was transferred to another caseworker in late 2019. An October 2019 case plan listed Tiffany's next steps as finding stable employment, engaging regularly with OCS, taking a parenting class at CITC,[5] and seeking counseling.[6] The caseworker testified that she encouraged Tiffany to "engage in medication management" and receive a parenting evaluation "[t]o establish if she was capable of parenting her child safely and effectively," but Tiffany declined to do either.

The caseworker testified that she was concerned about Tiffany's violent outbursts, tendency to blame others for her problems, "manic" behavior, and refusal to acknowledge Andi's autism diagnosis. She testified that she met with Tiffany in person at first but switched to telephonic meetings at Tiffany's request because of Tiffany's "lost trust." They generally met monthly and texted fairly often. OCS gave information about Andi's diagnosis to Tiffany's therapist so she could discuss it with Tiffany. The caseworker spoke with the therapist about Tiffany's difficulty in accepting Andi's diagnosis and attempted to speak with Tiffany about it as well.

OCS also referred Tiffany for urinalysis. In April 2020 Tiffany had an angry outburst at a testing site while waiting to be seen, after which the testing company barred Tiffany from its clinics.

---

[5] The caseworker testified at trial that she referred Tiffany to this class, though it is not clear whether this was a formal referral or just a recommendation that Tiffany enroll. It appears that Tiffany completed at least part of the class.

[6] OCS's next steps were to follow up with Tiffany to ensure she was continuing visitation and to follow up with providers to make sure she engaged in the recommended services.

In November 2020 Tiffany was arrested for assaulting her then-roommate and resisting arrest. She was released pending trial but placed on house arrest. At the termination trial she acknowledged resisting arrest but denied that she had otherwise done anything wrong.

Also in November, a new OCS caseworker took over Tiffany's case. The caseworker met with Tiffany by phone for about three hours and updated Tiffany's case plan based on the conversation. The new plan required Tiffany to continue counseling, research her recently diagnosed borderline personality disorder, avoid police contact, continue receiving CITC services, consider classes on parenting special-needs children, attend visits with Andi, meet with OCS, and communicate with her attorney. The plan did not list next steps for OCS and Tiffany again did not sign it. The caseworker had another two-hour case-planning meeting with Tiffany in December, and they exchanged texts between meetings.

The caseworker testified at trial that Tiffany initially struggled to accept Andi's autism diagnosis but now understood it. Tiffany was participating in parenting education and having regular visitation. Tiffany's therapist had dropped her as a client after Tiffany missed several appointments, but Tiffany remained interested in counseling, and the caseworker encouraged her to reach out to her therapist again. By the end of trial, according to Tiffany, she had reconnected with her therapist and was seeing her weekly by videoconference.

## D. ICWA Compliance And Tribal Notification

In its initial emergency petition filed in March 2017, OCS stated that Andi was believed to be an Indian child through Tiffany's possible affiliation with Hydaburg Cooperative Association, Metlakatla Indian Community, or White Earth Reservation. OCS sent notice letters to these three tribes. At the initial temporary custody hearing later that month, Tiffany reported that Andi's father was a member of "the Haida and

Tsimshian Tribe," that she was a member of the White Earth Tribe, and that Andi was not a member of any tribe but "will be soon." The court inquired again about ICWA's applicability at the continued hearing in April; OCS reported that Tuck had just recently notified it of an affiliation with "Tlingit Haida." OCS said it would send an ICWA notice to Tlingit & Haida, although there is no evidence it did so at the time.

In November 2017 the court held an adjudication hearing. Tiffany had signed a stipulation stating that Andi was a child in need of aid and was not an Indian child. At the beginning of the hearing, OCS reported that no tribes were involved in the case and the three tribes already notified — Hydaburg, Metlakatla, and White Earth — had each said Andi was not eligible for membership. The court instructed OCS to investigate the issue further, saying that in the meantime it would assume ICWA applied "just in case." The court issued an order finding Andi was a child in need of aid and might be an Indian child under ICWA.

At a February 2018 disposition hearing, the court again asked if Andi was an Indian child; OCS reported that it had not identified a tribe. The guardian ad litem (GAL) reminded the court of the parties' discussion of whether "the Tlingit Tribe was a possibility for dad." The court instructed OCS to send Tlingit & Haida a notice "to be absolutely on the safe side," saying: "It looks like this case is probably not an ICWA case, but we're going to dot our i's and cross our t's."

At the April 2018 permanency hearing the parties again discussed ICWA. OCS believed Tlingit & Haida had been notified but said it would follow up to make sure. At the next hearing, in August 2018, the parties did not discuss ICWA or tribal notice. A month later OCS filed a petition to terminate Tiffany's parental rights, stating that Andi was not an Indian child.

On January 14, 2019 OCS notified Tlingit & Haida of the termination proceedings. On February 1 Tlingit & Haida attested that Andi was "an enrolled member

or eligible for membership" and moved to intervene; the court granted the motion. In June OCS filed an amended petition noting that Andi was believed to be an Indian child and notified Tlingit & Haida of the petition. Tlingit & Haida thereafter participated in the proceedings, including at trial, where it supported termination.

### E. Termination Trial And Termination Order

The termination trial was held in January and March 2021. Ginny testified that though she and Ray hoped to adopt Andi, she also intended to continue encouraging a relationship between Andi and Tiffany. Three OCS workers testified that terminating Tiffany's parental rights was in Andi's best interests.

Several witnesses testified about Tiffany's temper and volatile relationship with Tuck, including reports of domestic violence. Tiffany testified that she experienced postpartum depression after Andi's birth and was working to improve her behavior. She denied having "fully resisted" Andi's autism diagnosis; she said she "didn't like what [she] heard when [she] first heard it" but now accepted it. Tiffany said if she received custody she would continue Andi's current services. She also said she was no longer in a relationship with Tuck.

The court issued an order in June terminating Tiffany's parental rights. The court made all the requisite findings, including that OCS made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the family.[7] Tiffany appeals, arguing that the termination order should be reversed for three reasons: (1) the superior court erred in finding that OCS made active efforts; (2) the court violated Tiffany's due process rights by relying on evidence not admitted at trial; and (3) the failure of timely notice to the tribe violated ICWA.

---

[7]     25 U.S.C. § 1912(d); CINA Rule 18(c).

## III. DISCUSSION

### A. OCS's Efforts Did Not Satisfy The ICWA Active Efforts Standard.

ICWA requires that prior to terminating parental rights to an Indian child, "a superior court must find by clear and convincing evidence that . . . 'active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.' "[8] Active efforts are "affirmative, active, thorough, and timely" and "must involve assisting the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan."[9] Efforts should be tailored to the "facts and circumstances of the case."[10]

However, "the active efforts requirement does not require perfection. Our concern is not with whether the State's efforts were ideal, but with whether they crossed the threshold between passive and active efforts."[11] "Passive efforts [occur] where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition."[12] Active efforts, in contrast, occur "where the state caseworker takes the client through the steps of the plan rather than requiring that" the client perform the plan's

---

[8] *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 760-61 (Alaska 2009) (quoting 25 U.S.C. § 1912(d) and CINA Rule 18(c)(2)(B)); *see also* 25 C.F.R. § 23.120 (2021).

[9] 25 C.F.R. § 23.2 (2021).

[10] *Id.*

[11] *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[12] *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157-58 (1984)).

requirements on his or her own.[13] Courts "conduct[] an active efforts inquiry on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[14] "[T]he trial court may consider all services provided during the family's involvement with OCS."[15]

Whether OCS's efforts satisfy the ICWA standard is a mixed question of law and fact.[16] "We review factual findings for clear error, reversing only if, after 'a review of the entire record in the light most favorable to the party prevailing below,' we are left 'with a definite and firm conviction that a mistake has been made.' "[17] "Whether the superior court's factual findings . . . satisfy ICWA is a question of law to which we apply our independent judgment."[18] "We 'bear in mind at all times that terminating parental rights is a drastic measure.' "[19]

The superior court in this case, in concluding that OCS made active efforts to reunite Tiffany with Andi, noted OCS's facilitation of regular visits, attempts to

---

[13]    *Id.*

[14]    *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013) (quoting *A.A.*, 982 P.2d at 261).

[15]    *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015).

[16]    *Philip J.*, 314 P.3d at 526.

[17]    *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009) (quoting *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 672 (Alaska 2008)).

[18]    *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021).

[19]    *Jon S.*, 212 P.3d at 761 (quoting *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 184 (Alaska 2008)).

provide services to Tiffany, and creation of case plans addressing her mental health, healthy relationships, parenting classes, and domestic violence. The court also observed that Tiffany declined to participate in most services, rejected a parenting evaluation, downplayed her problems, avoided discussions of domestic violence, and sought treatment only as a means of regaining custody of her daughter. The court considered Tiffany's "own actions and level of effort in determining whether [OCS] has done enough" and concluded that she "actively resisted" or only "provided empty words" in every area except visitation. The court also noted Tlingit & Haida's support for termination, which the court attributed partly to the "belief that [Tiffany] will continue to cycle through moments of calm, and then violent behavior despite the services and efforts that have been provided for her."[20]

We reach a different conclusion as to whether the ICWA active efforts standard was satisfied. As noted above, active efforts require OCS to "tak[e] a parent through the steps of a plan and help[] the parent develop the resources to succeed; drawing up a case plan and leaving the client to satisfy it are merely passive efforts."[21] We conclude that this case is largely an example of the latter.

---

[20]    Tiffany argues that the superior court improperly deferred to Tlingit & Haida's support for termination, violating its "duty to independently determine the facts and arrive at its own conclusions." We disagree. The superior court's order indicates that it applied its independent judgment.

Tiffany also argues that the superior court clearly erred when it found that she "downplayed an incident where she had stabbed" Tuck by testifying that "she was just trying to disarm [him] in order to protect him from harming himself." We agree that this finding misstates Tiffany's testimony, but we need not decide whether it is harmless error because we reverse the termination order on other grounds.

[21]    *Jon S.*, 212 P.3d at 763.

For ease of analysis we divide OCS's efforts toward Tiffany and Andi into five time periods: (1) the first seven months of the case; (2) the two-year period from October 2017 to September 2019 (about which minimal evidence was offered); (3) the nine months from October 2019 to July 2020; (4) another three-month gap in the record of services provided; and (5) the two months immediately preceding trial.

### 1.    March-September 2017

OCS assumed custody of Andi in March 2017 and created Tiffany's first case plan that May. The plan called on OCS to refer Tiffany for a neuropsychological exam, but OCS did not do so because it could not obtain a release of information from Tiffany allowing it to share her records. Tiffany missed two meetings OCS arranged for getting her signature.[22] There is no evidence that OCS revisited the issue until late 2019, when Tiffany signed a release to allow OCS to discuss her case with her therapist.

---

[22]    Tiffany argues that OCS should have sought a court order to get access to her medical records in order to support the referrals. She contends that "in situations such as this, where a parent's untreated mental illness manifests as a dislike of authority and shifting of blame, a court order is a practical workaround to a parent's initial mistrust, before the necessary services have been undertaken." OCS did seek such an order later, in preparation for trial, suggesting that it could have done so earlier. *See, e.g.*, *Addy S. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, S-17257, 2019 WL 3216807, at *4 (Alaska July 17, 2019) (noting that OCS obtained court order for medical records in support of referral for mental health treatment after mother refused to sign releases).

We have observed, however, that "requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on the department and the court system." *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 530 (Alaska 2013) (quoting *Wilson W. v. State, Off. of Child.'s Servs.,* 185 P.3d 94, 102 (Alaska 2008)). We do not impose such a requirement, but we do encourage OCS to consider in similar cases whether court orders will advance the goal of reunification.

Further efforts to obtain releases of information during these initial two years might have allowed Tiffany to be assessed and treated much earlier.

OCS did make other efforts during this time, including providing Tiffany with bus passes and arranging for a cab on at least one occasion. During this time and throughout the case, OCS also facilitated visitation between Tiffany and Andi and arranged services for Andi.

### 2. October 2017-September 2019

There is little evidence that OCS made active efforts during the next two years, from October 2017 to September 2019.[23] But this gap in the record, though long, is not necessarily dispositive, as "we measure active efforts over the entirety of the case."[24] We also note that for much of this period there was some uncertainty as to whether this was an ICWA case subject to the active efforts standard.

### 3. October 2019-July 2020

A new OCS worker was assigned to the case in October 2019, and she created a new case plan. The plan required of OCS only that it follow up with Tiffany to make sure she attended visitation and that it follow up with providers to make sure she had engaged in the recommended services. The burden was on Tiffany to reach out to these providers, and OCS offered little evidence that it took any steps to help her accomplish case-plan goals such as finding stable employment and enrolling in a

---

[23] The February 2018 case plan created during this gap again states that OCS will make referrals for a neurological assessment and mental health counseling. No evidence was offered to suggest that this occurred or that OCS again sought a release of information from Tiffany.

[24] *Jon S.*, 212 P.3d at 766; *see also Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 608 (Alaska 2021) ("Periods of inadequate efforts by OCS lasting 'for a matter of months' do not necessarily 'render the entirety of [OCS's] efforts inadequate.' " (quoting *Philip J.*, 314 P.3d at 528)).

parenting class.[25] The caseworker testified that she encouraged Tiffany to participate in a parenting assessment and to consider medical management, but after Tiffany expressed disinterest OCS did not include these steps in the case plan, explore alternatives, or discuss them further.

Around this time Tiffany signed a release of information allowing OCS to share her medical records with her therapist; the caseworker also spoke with Tiffany's therapist about her case and her needs.[26] We commend this effort by OCS, which reaches the level of active engagement that ICWA demands. OCS also referred Tiffany to urinalysis.

Tiffany's interactions with the assigned OCS caseworker became increasingly antagonistic. The caseworker met with Tiffany in person only two or three times and then accommodated Tiffany's request that further meetings be by phone. The caseworker testified that the two spoke for the last time in April 2020; the caseworker texted Tiffany in July following "an assault incident by [Andi's father]," but, according to the caseworker, Tiffany "didn't want to react with [her]" anymore after that. The caseworker continued to reach out to Tiffany on at least a monthly basis, generally by text message.

---

[25] Andi's GAL asserts that the caseworker referred Tiffany to parenting and healthy relationships classes. The caseworker testified that she referred Tiffany to the healthy relationships class, but she also stated that Tiffany herself "got [the parenting classes] organized." As noted above, the case plan gave Tiffany the responsibility to reach out to the providers. The superior court did not make specific findings about these classes.

[26] Tiffany found her therapist herself. One case plan indicates that she elected to "get her own counseling services."

### 4. August-October 2020

From August through October 2020 Tiffany's case was with another caseworker. No evidence was offered at trial about OCS's efforts during this three-month period.

### 5. November 2020-January 2021

A new caseworker assumed responsibility for Tiffany's case less than two months before trial and created a fourth case plan. This plan listed a number of activities for Tiffany: continuing mental health counseling, learning about her borderline personality disorder, contacting her former therapist to "ask[] for continued services, and if that does[n't] work out start looking for a new counselor," and contacting potential providers for parenting classes. The plan did not require any actions by OCS; under the heading "OCS Specialist's next steps (referrals needed for services, travel, funding, family contact, etc.)," the form is left blank.[27] The caseworker testified that she encouraged Tiffany to continue with therapy and to consider the parenting classes. But OCS presented no evidence of any further effort to help Tiffany achieve the case plan's goals.[28] The caseworker testified in January 2021 that she planned to check in with

---

[27] The caseworker testified that during her first call with Tiffany, the two discussed "a little bit about what borderline personality disorder entails," such as "the impulse control and the heightened responses to experiences borne from . . . trauma."

[28] As we have previously asked when evaluating active efforts: after OCS recommended treatment for a parent, "did it help [the parent] identify appropriate programs and complete the necessary paperwork to apply?" *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 982 (Alaska 2019). After recommending parenting classes, "did it provide [the parent] a schedule for those classes, give reminders, or check in afterward to confirm . . . attendance?" *Id.* The record does not disclose that OCS took such actions.

The caseworker testified that Tiffany's options for seeking services were
(continued...)

Tiffany later that month to see whether she had been successful in restarting her counseling sessions, an activity the plan left to Tiffany herself. And although the caseworker testified she would "continue" to help Tiffany with "technological assistance[,] . . . helping set up appointments or doing referrals" while the case remained open, OCS did not provide evidence that such support was provided prior to the trial.

In arguing that it made active efforts, OCS emphasizes Tiffany's unwillingness to cooperate. The superior court agreed that this was important, finding that, other than her participation in visitation, Tiffany "either actively resisted [OCS's efforts] or she provided empty words." But while a parent's unwillingness to participate may influence what rehabilitative efforts OCS pursues, "the [parent's] lack of effort does not excuse OCS's failure to make and demonstrate its efforts."[29]

The four-year history of this case preceding trial includes long stretches of time for which there is no evidence of OCS efforts, some instances of laudable efforts, and some periods when OCS recommended programs but otherwise left Tiffany largely to her own devices — the definition of passive efforts that fail to meet ICWA's exacting standard. Viewing the case in its entirety, we hold that OCS did not demonstrate by clear and convincing evidence that it made active efforts as required under ICWA. For that reason we reverse the superior court's termination order.

---

[28] (...continued) limited because she was under house arrest at this time. It remains true, however, that the case plan specifically required Tiffany, rather than OCS, to reach out directly to possible providers to inquire about available services.

[29] *Id.* at 983.

**B. A Termination Order Must Rely Only On Properly Admitted Evidence.**

Tiffany also argues that the superior court improperly relied on evidence that was not admitted at trial, violating her right to due process. She observes correctly that the factual findings in the termination order begin with several pages of "general facts" that "appear to be taken almost word-for-word from information contained in the second amended termination petition, which was not admitted into evidence at trial." Tiffany points to numerous passages from this section that she argues are unsupported by admitted evidence.

When a trial court is required "to make specific factual findings and legal conclusions[,] . . . then the court's decision must be based only upon evidence admitted pursuant to legal rules."[30] If the superior court did rely on facts from the unadmitted termination petition when deciding to terminate Tiffany's parental rights, that reliance was improper.[31] Our next step would ordinarily be to determine whether the error was prejudicial, " 'disregard[ing] any error or defect in the proceeding which does not affect the substantial rights of the parties' and act[ing] only when the result is otherwise 'inconsistent with substantial justice.' "[32] But because we reverse the termination order

---

[30] *Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 629 (Alaska 2018).

[31] *See In re Hospitalization of Rabi R.*, 468 P.3d 721, 731-32 (Alaska 2020) (holding that if trial court relied on allegations from evaluation and commitment petitions — which were not admitted at commitment hearing — it would constitute error); *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1105 (Alaska 2011) (holding that trial court should not have considered evidence of alleged arrest that was not admitted at termination trial).

[32] *In re Rabi R.*, 468 P.3d at 732-33 (quoting Alaska R. Civ. P. 61 and holding error was harmless where "other evidence in the record provide[d] ampl[e] support for
(continued...)

on other grounds, we do not address this issue further except to reiterate that a termination order's findings must be based solely on properly admitted evidence.

### C.     The Violation Of ICWA's Notice Requirement Was Harmless.

Tiffany also argues that OCS and the superior court violated ICWA's notice requirements and that these violations require reversal of the termination order. While we agree that there was an ICWA violation, Tlingit & Haida nonetheless intervened a full two years before termination and was involved through trial, and any error was necessarily harmless.[33]

ICWA requires that courts and child welfare agencies inform tribes of removal or termination proceedings involving Indian children.[34]  25 U.S.C. § 1912(a) provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the . . . termination of parental rights . . . shall notify . . . the Indian child's tribe . . . of the pending

---

[32]     (...continued)
the court's conclusion").  The GAL argues that Tiffany waived this argument because she did not raise it before the superior court.  But Tiffany was not aware that the court would rely on the petition "until after the court had already relied upon" it, and the argument is not waived.  *Diego K.*, 411 P.3d at 629.

[33]     Tiffany concedes that she did not raise this issue below.  Although we typically "do not review issues not raised at trial except for plain error," *In re Adoption of L.E.K.M.*, 70 P.3d 1097, 1100 (Alaska 2003), we do not treat this issue as waived. ICWA excuses a parent's failure to raise the notice issue in superior court and allows a parent to "petition any court of competent jurisdiction to invalidate [the termination of her parental rights] upon a showing that such action violated any provision of" 25 U.S.C. §§ 1911-1913. *In re L.A.M.*, 727 P.2d 1057, 1059-60 (Alaska 1986); 25 U.S.C. § 1914.

[34]     *See also* Alaska CINA Rule 7(f)(1).

proceedings."[35] Further, "[n]o . . . termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the . . . tribe . . . . [T]he tribe shall, upon request, be granted up to twenty additional days to prepare for such a proceeding."[36] The failure to identify Tlingit & Haida until two years into the proceedings in this case violated ICWA.[37]

---

[35] *See also* 25 C.F.R. § 23.111(a)-(b) (2022) (requiring the court to "ensure" that OCS notifies the tribe upon having reason to know that a child is an Indian child).

[36] 25 U.S.C. § 1912(a). A court must "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." 25 C.F.R. § 23.107(a) (2022). If "there is reason to know the child is an Indian child, but the court does not have sufficient evidence" to make a final determination, "the court must . . . [c]onfirm by way of a report, declaration, or testimony included in the record that [OCS or another party] used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or another party eligible for membership), to verify" the child's Indian status. 25 C.F.R. § 23.107(b). A court has reason to know a child is an Indian child when, among other reasons, "(1) any participant in the proceeding . . . informs the court that the child is an Indian child; [or] (2) any participant in the proceeding . . . informs the court that it has discovered information indicating that the child is an Indian child[.]" 25 C.F.R. § 23.107(c). If there is reason to know a child may be an Indian child, the court must "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an 'Indian child.' " 25 C.F.R. § 23.107(b)(2).

[37] Tiffany alleges several violations: (1) at the initial temporary custody hearing, despite having reason to know Andi was an Indian child, "the trial court did not inquire as to whether any of the parties had reason to know if Andi was an Indian child and did not make removal findings necessary under ICWA"; (2) at the continued hearings in March and April "the court failed to explicitly inquire of the parties as to whether anyone had reason to know of Andi's status as an Indian child"; (3) the court did not confirm whether OCS used due diligence to determine whether Andi was an Indian child; (4) the court did not consistently make ICWA findings despite having reason to know Andi was an Indian child; and (5) OCS did not act with due diligence in

(continued...)

Tiffany argues that this error was not harmless; Tlingit & Haida did not intervene for nearly two years after removal, after OCS had already filed a termination petition and the court had approved the goal of adoption. Had Tlingit & Haida been notified earlier, Tiffany contends, the outcome might have been different. She suggests the court might have "substantially remed[ied] the violation by, for instance, vacating the adjudication and disposition orders and returning to a goal of reunification, or by finding that no active efforts existed for the initial two-year period when OCS failed to notify the tribe."

Tlingit & Haida disputes Tiffany's claim of prejudice. Emphasizing the importance of tribal notice, it writes that "[o]rdinarily . . . failure to provide a Tribe notice of ICWA proceedings is a critical error that can materially affect the outcome of a case." But "there must be ways to cure defects in notice." Here, Tlingit & Haida reviewed the termination petitions, intervened two years before trial, worked with the family and OCS for those two years, and participated in two years of proceedings. Tlingit & Haida contends that under the circumstances "remand would serve little useful purpose"; "there would be no new inquiry to make, no new notice to provide, and no new procedure to follow." Tlingit & Haida asserts that the procedure and outcome of a new trial would be the same as the one already conducted.

We agree with Tlingit & Haida that the late notice in this case had no discernible effect on the outcome. Although the failure to notify Tlingit & Haida until two years into the proceedings was a serious ICWA violation, it was ultimately rendered

---

**37** (...continued)
notifying Tlingit & Haida. OCS acknowledges at least the last alleged error: that ICWA's requirement of notice to Tlingit & Haida was triggered at the April 17, 2017 final probable cause hearing but "for unknown reasons" OCS did not send proper notice until January 2019.

harmless by proper notice two years before the termination trial.  No additional remedy is required under these circumstances.

**IV.    CONCLUSION**

The termination order is REVERSED and the case REMANDED for further proceedings consistent with this opinion.

WINFREE, Chief Justice, with whom HENDERSON, Justice, joins, dissenting.

I respectfully disagree with the court's conclusion that the record in this case does not support the superior court's "active efforts" finding necessary to support the termination of Tiffany's parental rights to Andi. I agree with the superior court's conclusion to the contrary, which was and is supported by the Tribe.

I agree with the court's emphasis that a superior court's termination order must rely only on properly admitted evidence. Although the court does not reach the issue, I conclude that there was sufficient properly admitted evidence to support the superior court's termination order.

Finally, I agree with the court's conclusion affirming the superior court's determination — supported by the Tribe — that the violation of tribal notice requirements was, on the facts of this case, harmless error.

I would affirm the superior court's order terminating Tiffany's parental rights to Andi.